UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Alexandra A. Dreibelbis, <br><br>  Plaintiff, <br><br> v. <br><br> TransUnion, LLC; The Pennsylvania State University; and DOES 1 through 100 inclusive, <br><br>  Defendants. | CASE NO. 5:22-cv-117 |

COMES NOW Plaintiff **ALEXANDRA A. DREIBELBIS** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2. Defendant The Pennsylvania State University ("Penn State") is not reporting the Plaintiff's account accurately as discharged in bankruptcy.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetuate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14. Plaintiff alleges that the Penn State account was included in her Chapter 13 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

15. Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged to be reported on a credit report as collectible as this reporting does not reflect the debt is no longer owed.

16. Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

17. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

18. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

19. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

20. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    e-OSCAR**

21. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

22. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

23. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

24. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

25. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

26. For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**B.     Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

27.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

28.     Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

29.     The Consumer Information Indicator ("CII") is a critical field in the Metro 2 format that indicates a special condition that applies to a specific consumer.

30.     Under Metro 2, the CII must be reported on only the consumer to whom the information applies.

31.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

32.     In the consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed and is active, but no discharge has been entered.

33.     CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

34.     The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed, but the chapter is undesignated/unknown.

35.     The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

36.     The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged. In addition, post discharged balances and past due balances should be updated to reflect zero (0) balances. The payment history should also not reflect missed payments moving forward.

37.     The CII Metro 2 Code "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

38.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

39. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

40. Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

41. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

42. The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

43. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

44. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

45. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**C.   Plaintiff Filed Bankruptcy and Received a Discharge**

46. Plaintiff filed a voluntary petition for Chapter 13 bankruptcy on March 30, 2018, in order to repair her creditworthiness and Credit Score.

47. The Chapter 13 Trustee entered its Chapter 13 Standing Trustee's Final Report and Account on May 26, 2021.

48. Plaintiff's bankruptcy was discharged on April 5, 2021.

**D.   Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

49. On April 19, 2021, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "April 19 Credit Reports").

50. Plaintiff noticed an adverse tradeline in her April 19 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

51. Plaintiff then disputed the inaccurate tradeline regarding the Penn State account via certified mail to TransUnion on or about July 19, 2021 (the "Dispute Letter").

52. Plaintiff's Dispute Letter specifically put Penn State on notice that she filed for Chapter 13 bankruptcy and received a discharge and the reporting should be updated.

53. Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the account, addressing each tradeline individually.

54. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

55. Plaintiff is informed and believes that TransUnion received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to Penn State, as the data furnisher, via an ACDV through e-OSCAR.

56. On September 7, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if her account was updated.

   a.   **Inaccuracy – Penn State**

57. Despite actual knowledge, Penn State continued to report Plaintiff's account, beginning in 0280EBXXXXXXXXXXXX, to TransUnion as collectible and without notice of the bankruptcy. This tradeline is patently incorrect as the account was discharged in bankruptcy.

58. Plaintiff alleges that Penn State did not investigate whether Plaintiff filed for bankruptcy.

59. Penn State did not update the tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

60. TransUnion provided notice to Penn State that Plaintiff was disputing the inaccurate and misleading information, but Penn State failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

61. Based upon Plaintiff's dispute, Penn State should have known that Plaintiff received a discharged in her bankruptcy proceedings.

62. The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 13 bankruptcy and received her discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

63. Plaintiff alleges that Penn State did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's account.

64. If Penn State reviewed such standards, or its own internal records regarding Plaintiff's account, Penn State would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

65. Penn State should have updated each tradeline to CII to Metro 2 Code "H" to reflect the debt was discharged in Plaintiff's Chapter 13 bankruptcy and stop reporting the debt as collectible.

66. By continuing to report Plaintiff's account to TransUnion as described in paragraph 57, it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy but is still owed and collectible, which is inaccurate.

67. Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

68. As payment history makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's Credit Score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect status and payment history reported by Penn State on the account is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

69. The lack of investigation and reporting of inaccurate and incomplete information by Penn State is unreasonable.

**E.     Damages**

70. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

71. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

72. Penn States' actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

73.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     TransUnion Failed to Assure Credit Reporting Accuracy**

74.     TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

75.     Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the Penn State account as described herein.

76.     TransUnion knew, or should have known, (1) that the Penn State account was discharged in bankruptcy, and (2) that the account should not be reporting "120 Days Past Due" as the debt was discharged. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

77.     As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.     Willful Violations**

78.     TransUnion's violations, as described herein, were willful; specifically, TransUnion has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

79.     TransUnion regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, TransUnion regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

80.     To the extent TransUnion does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

81. TransUnion's employees receive little to no training concerning how to accurately report consumer debt.

82. Instead, TransUnion's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

83. TransUnion's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

84. TransUnion has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

85. As a result of TransUnion's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

86. TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

87. In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

88. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

### (Against Defendants and Does 1-100)

89. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Penn State Failed to Reinvestigate Following Plaintiff's Dispute**

90. Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

91. After receiving notice that Plaintiff filed for Chapter 13 bankruptcy, Penn State sent an AUD or monthly transmission to TransUnion reporting Plaintiff's account as past due.

92. After receiving notice of the bankruptcy discharge, Penn State did not update the incorrect reporting to TransUnion.

93. After receiving the Dispute Letter, Penn State did not correct the tradeline, instead it verified and re-reported the tradeline as "120 Days Past Due" via ACDV to TransUnion.

94. Penn State violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

95. TransUnion provided notice to Penn State that Plaintiff was disputing the inaccurate and misleading information; however, Penn State either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

96. Based on Plaintiff's dispute and review of its internal records on the account, Penn State should have known its account was discharged in bankruptcy and ceased its inaccurate reporting.

97. Reporting a discharged debt as past due is patently incorrect.

98. In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Penn State's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

**B.   Willful Violations**

99. Plaintiff alleges that Penn State has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

100. Plaintiff further alleges that Penn State has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

101. Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Penn State's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

102. In the alternative, Penn State was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

C.  **TransUnion Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

103. Pursuant to 15 U.S.C. 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the Penn State account.

104. Thus, TransUnion failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

105. TransUnion is not a passive entity bound to report whatever information a data furnisher provides.

106. Plaintiff alleges TransUnion is readily familiar with FCRA requirements and credit reporting industry standards.

107. Based on the foregoing, Plaintiff alleges that TransUnion can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

108. TransUnion can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

109. TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that Penn State was not reporting its account at issue correctly.

110. Had TransUnion conducted a proper investigation, it could have closed or bookended the Penn State debt by adding a notation on the credit report to show that the debt was in fact discharged in bankruptcy and removed the account from being collectible. However, TransUnion continued to report the account as described herein.

111. TransUnion, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

112. In the alternative, Plaintiff alleges that TransUnion did not send an ACDV to Penn State to confirm accurate reporting on its account. Despite receiving the Dispute Letter providing

notice of the inaccuracies, TransUnion did not delete or correct the tradelines or conduct an investigation.

113. In the alternative, if TransUnion deemed Plaintiff's Dispute Letter as "frivolous or irrelevant" under 15 U.S.C. 1681i(a)(3), TransUnion failed to notify Plaintiff of such determination as required by 15 U.S.C. 1681i(a)(3)(B). As Plaintiff received no such notice from Transunion, Plaintiff alleges TransUnion deemed her Dispute Letter valid, and thus triggered its obligations under 15 U.S.C. 1681i(a)(1) and (2)(A), for which it did not comply.

## THIRD CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
### (Against Defendants and Does 1-100)

114. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    TransUnion Failed to Review and Consider all Relevant Information**

115. TransUnion violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

116. TransUnion's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

117. TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

118. In the alternative, TransUnion was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

119. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

120. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   TransUnion Failed to Delete Disputed and Inaccurate Information**

121. TransUnion violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

122. TransUnion's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

123. TransUnion's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

124. In the alternative, TransUnion was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

125. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

126. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

   e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

f.  For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: February 10, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

                                            Respectfully submitted,

                                            **SCHUMACHER LANE PLLC**

Dated: February 10, 2022                      */s/ Kyle Schumacher*
                                                                         Kyle Schumacher
                                                                         Attorneys for Plaintiff